# Accessibility Guidelines and Federal Lease Renewals

The Architectural and Transportation Barriers Compliance Board may require, pursuant to the Architectural Barriers Act of 1968, that buildings first leased by federal agencies after 1976 be brought into compliance with current accessibility standards when the agency negotiates renewal of the lease.

May 26, 1999

MEMORANDUM OPINION FOR THE DEPUTY GENERAL COUNSEL
U.S. ARCHITECTURAL AND TRANSPORTATION BARRIERS
COMPLIANCE BOARD

This responds to your request for our opinion whether guidelines to be issued by the Architectural and Transportation Barriers Compliance Board ("Board" or "Access Board") under the Architectural Barriers Act of 1968, 42 U.S.C. §§ 4151–4157 (1994) ("Act" or "Barriers Act"), may require that buildings first leased by federal agencies after 1976 be brought into compliance with updated accessibility standards when the agency negotiates renewal of the lease. *See* Letter for Dawn E. Johnsen, Acting Assistant Attorney General, Office of Legal Counsel, from Elizabeth A. Stewart, Deputy General Counsel, U.S. Architectural and Transportation Barriers Compliance Board (June 10, 1998) ("Board Letter"). Following receipt of your opinion request, we have received and considered additional submissions from both the Board and the United States Postal Service ("USPS" or "Service"). We conclude that the Board may lawfully issue guidelines including such a requirement.

## I. BACKGROUND

The Act requires four federal departments and agencies (in consultation with the Secretary of Health and Human Services) to promulgate standards for the design, construction, and alteration of buildings occupied or used by federal agencies "to insure whenever possible that physically handicapped persons will have ready access to, and use of, such buildings." 42 U.S.C. §§ 4152–4154a. The Administrator of General Services has general responsibilities for prescribing standards for buildings covered by the Act, *id.* § 4152, while the Secretary of Housing and Urban Development, the Secretary of Defense, and the U.S. Postal Service have separate authority to set standards under the Act for buildings used by their respective departments or services. *See id.* §§ 4153–4154a. The Act further requires that "[e]very building designed, constructed, or altered after the effective date of a standard issued under this chapter which is applicable to such building, shall be designed, constructed, or altered in accordance with such standard." *Id.* § 4155.

111

It is not in dispute that the Act applies in general terms to buildings that are leased in whole or in part by federal agencies. *See id.* § 4151(2) (defining "building" to include any building or facility "leased in whole or in part by the United States"). The narrower question presented here concerns the timing and extent of compliance obligations — i.e., whether the Board may require a federal lessee renegotiating a lease to modify or retrofit a building to conform to current accessibility standards.

Pursuant to the Rehabilitation Act of 1973, the Access Board was granted authority to establish minimum guidelines and requirements for, and to enforce, the accessibility standards issued by the four departments and agencies designated under the Barriers Act. *See* 29 U.S.C. § 792(b)(1), (3)(A) (1994 & Supp. IV 1998). The minimum Guidelines issued by the Board in 1981 are codified at 36 C.F.R. pt. 1190 (1998).[1] The Board is revising its guidelines to conform more closely to the accessibility requirements of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (1994 & Supp. II 1996), and anticipates issuing a notice of proposed rulemaking for adoption of the new guidelines in the near future. Among other things, the Board proposes that the revised guidelines require compliance with revised accessibility standards in all buildings or facilities for which leases — including renewals of expired leases — are negotiated by a federal agency after the effective date of the revised standards adopted pursuant to the revised guidelines. This requirement is to be embodied in Section F202.6 of the proposed revised guidelines, which provides:

> *F202.6 Leases.* Buildings or facilities for which new leases are negotiated by the federal government after [effective date of the revised accessibility standard], including new leases for buildings or facilities previously occupied by the federal government, shall comply with F202.6 [requiring that designated elements of leased space be accessible].

Letter for Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Zoe Strickland, Attorney, U.S. Postal Service, *Re: Access Board Request for Opinion on ABA Leasing*, Attachment D at 1 (Sept. 30, 1998) ("USPS Letter"). As further explained in the Board's submission, a "new lease" that triggers compliance obligations would include "the negotiation of an agreement to lease a building or facility, regardless of whether the leased space was previously occupied by the Federal government." Board Letter, Attachment A at 1.

---

[1] The current Board guideline on leasing does not expressly require accessibility compliance as a condition of a federal agency's entering into or renewing a lease *See* 36 C.F.R. § 1190.34. Rather, it requires that when a facility that meets, or most closely meets, the current accessibility standard is available for leasing, the renting agency must give a reasonable preference to that facility. *Id.* § 1190 34(a)

Subsequently, in response to a request for clarification from this Office, the Board has stated that its proposed revised guidelines will also include the following explanatory text or commentary:

> The negotiation of a new lease occurs when (1) the Federal government leases a facility that it did not occupy previously; or (2) an existing term ends and a new lease is negotiated for continued occupancy. The unilateral exercise of an option which is included as one of the terms of a preexisting lease is not considered the negotiation of a new lease. Negotiations which do not result in a lease agreement are not covered by the guidelines.

Letter for George Smith, Office of Legal Counsel, from Elizabeth A. Stewart, Deputy General Counsel, U.S. Architectural and Transportation Barriers Compliance Board, Attachment at 2 (Dec. 21, 1998) ("Board Supplement").[2]

The Postal Service contends that the Board is not authorized to require federal agencies to render a building accessible under updated Barriers Act standards upon renewing an expiring lease if the building was originally leased after January 1, 1977, and previously rendered accessible under Barriers Act standards then in effect. The Board has therefore requested our opinion to resolve this question.[3] In addition to the Board's two submissions on the issues presented, we have received and considered two submissions from the Postal Service as well. *See* USPS Letter; Letter for George Smith, Office of Legal Counsel, from Zoe Strickland, Attorney, U.S. Postal Service, *Re: Access Board Request for Opinion on ABA Leasing* (Jan. 7, 1999) ("USPS Supplement"). The Postal Service summarized its contentions in the following terms:

> The Access Board lacks the authority to issue the leasing guidelines described above because it is contrary to the ABA, which is not tied to negotiations *and only covers renewals of pre-1977 leases*, and because the ABA standard-setting agencies, not the

---

[2] The last sentence of the above-quoted clarification resolves any possible ambiguity created by the language in Section F202 6, providing that accessibility compliance obligations are triggered whenever "new leases are negotiated." In the absence of a definition of the term "negotiated," the provision might be construed to impose compliance obligations on the basis of negotiations alone, even before a new lease is actually executed or undertaken We believe the inclusion of the above-quoted clarification will adequately address this potential ambiguity, as well as the USPS argument that the proposed guidelines are invalidly "tied to negotiations," USPS Letter at 2.

[3] In a memorandum transmitted to this Office by fax on August 11, 1998, the Board refined and clarified the question originally presented by providing the following illustrative hypothetical of how its proposed interpretation would apply if adopted:

> The U S Postal Service (USPS) leases a facility in 1990. The lease is for a term of 15 years. The facility complies with the accessibility standards in effect in 1990. Subsequently, the Access Board issues new accessibility guidelines and each of the standard setting agencies revise their standards based on the new guidelines The new standards are effective September 1, 1998 In the year 2005, the USPS negotiates a lease to continue occupying the facility for another 15 years. The facility must meet the revised accessibility standards in effect in the year 2005

Board, are authorized to issue regulations defining statutory coverage.

USPS Letter at 2 (footnote omitted) (emphasis added). More specifically, the Service asserts that the Act requires agencies to render leased buildings accessible in compliance with governing standards only at the time the lease is initially entered or, in the case of "grandfathered" leases entered by the agency *before* 1977, on the occasion of the first renewal of such lease. The Service vigorously contests the Board's authority to issue guidelines requiring updated accessibility whenever an agency enters into a negotiated renewal of an expiring post-1976 lease of a building that has been previously rendered accessible under the statutory requirements.

## II. ANALYSIS

### A.

This Office has addressed in prior opinions a number of closely related issues concerning application of the Act to federally leased facilities. Those opinions, together with a case from the U.S. Court of Appeals for the Ninth Circuit (discussed in Point II.B, *infra*), establish the legal framework for resolving this matter.

In 1980, we considered whether the accessibility guidelines proposed by the Access Board pursuant to 29 U.S.C. § 792(b) exceeded the Board's statutory authority or improperly usurped the standard-setting authority of the designated standard-setting agencies. *See* Memorandum for Mason H. Rose, V, Chairperson, Architectural and Transportation Barriers Compliance Board, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 31, 1980) ("1980 Opinion"). In upholding the Board's authority to issue detailed and substantive accessibility guidelines against a challenge by the standard-setting agencies, we stated:

> Congress has given little guidance to determine the nature and limits of the Board's authority. *In such circumstances, the Board has a great deal of discretion, even if the practical effect of its construction is to constrain the authority of the standard-setting agencies.*
>
> . . . .
>
> It is plain that Congress accorded rulemaking authority to the Board because of its dissatisfaction with the performance of the standard-setting agencies. *Congress intended the Board to establish minimum*

> *requirements assuring both a certain level of protection for the handicapped* and some uniformity in federal accessibility standards.

*Id.* at 4–5 (emphasis added).

Our 1980 opinion thus recognized that the Board has been granted broad authority and discretion to issue minimum accessibility guidelines that the designated agencies must follow in setting their respective accessibility standards under the Act. We went on to elaborate upon the scope and purpose of the Board's guideline-setting authority: "As a 'minimum,' the Board must thus establish the lowest of a range of requirements that, in its view, *will achieve the congressional goal of 'ready access and use.' " Id.* at 5 (emphasis added). We added that "if the Board is not permitted to require that all of certain facilities be accessible, it could be viewed as violating the terms of the Act." *Id.* at 7. We further determined that the Board's authority extends to issuing guidelines interpreting the Act's accessibility requirements as applied to leasing arrangements, including interpretations determining the circumstances under which leased facilities are covered by the Act's requirements. *See id.* at 14–17.

Thus, our 1980 opinion clearly rejected the contention now advanced again by USPS (*see* USPS Letter at 2, 5, and 10) that the Board lacks basic statutory authority to promulgate substantive guidelines covering matters such as the extent of statutory coverage (including guidelines respecting the coverage of leased facilities).[4] Nothing contained in the USPS submissions herein persuades us to alter that conclusion.

Our 1980 opinion also recognized that the 1976 amendments to the Act, *see* Public Buildings Cooperative Use Act of 1976, Pub. L. No. 94–541, §§ 201–203, 90 Stat. 2505, 2507–08, "were plainly designed to bring leased buildings within the coverage of the Act. . . . [W]e think it evident that Congress intended by its 1976 amendments to make the Act applicable to buildings leased by the United States . . . . Since the congressional purpose is unambiguous, we do not believe that [42 U.S.C. §] 4155 is to be read to exclude leased buildings from the accessibility requirements of the Act." 1980 Opinion at 16.[5] Moreover, in responding to a contention that the guidelines had exceeded the Board's authority by applying the Act's requirements to mere unilateral "extensions" of agency leases, we stated:

---

[4] Specifically, under USPS's reading of the Barriers Act, "the Board issues technical requirements and scoping, and the standard-setting agency    . should set statutory coverage, effective dates, etc " USPS Letter at 10 This restrictive interpretation of the Board's authority to issue substantive guidelines is incompatible with the broad, discretionary authority we recognized in our 1980 opinion *See* 1980 Opinion at 4, 6

[5] Our specific reference to 42 U.S.C. § 4155 was in response to arguments by some agencies that Congress's failure to modify that section as well in 1976 indicated that Congress did not intend the act of leasing itself— as distinguished from design, alteration, or construction—to trigger any accessibility compliance action Section 4155 provides that covered buildings "shall be designed, constructed, or altered in accordance with [governing accessibility standards]," without making explicit reference to leasing as such In rejecting this agency argument, we stated: "There is no doubt that Congress believed that its amendment of the definition of the word 'building' was sufficient to bring leased buildings within the coverage of the Act " 1980 Opinion at 16.

115

> We see no sufficient basis for rejecting the Board's interpretation
> of the Act. The distinction between "renewals" and "extensions"
> is an uncertain one that is frequently not followed by the courts
> and there is absolutely no evidence that Congress intended to
> exclude "extensions" as technically defined by the Postal Service.

*Id.* at 17 (citations omitted).

In 1982, we advised the Justice Department's Civil Division that the Postal
Service's position that the Act permits federal agencies to lease buildings in their
existing conditions was a "permissible" interpretation of the Act that could prop-
erly be defended in court (*see infra* Point II.B). The interpretation in question
would have permitted federal agencies to lease accessibility-noncompliant
buildings in their existing condition, and did not mandate the accessibility alter-
ation of existing buildings as a condition to leasing; rather, compliance with the
Act's accessibility standards would have to be achieved only when the leased
building would otherwise be *altered*. We concluded that the Postal Service
interpretation was a "permissible" and certainly "defensible" one, although we
also acknowledged that the inquiry presented a "close question." *See* Memo-
randum for J. Paul McGrath, Assistant Attorney General, Civil Division, from
Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re:
Applicability of Architectural Barriers Act to Buildings Leased by the United
States Postal Service* at 2, 16 (Oct. 21, 1982) ("1982 Opinion"). Our opinion
stated:

> [W]e believe that an entirely defensible position may be taken that
> the Act does not obligate any federal department or service to alter
> all buildings leased after January, 1977 solely for the purpose of
> providing access for the handicapped. We conclude that the Postal
> Service regulations which require newly constructed leased
> buildings and any remodeling of buildings leased after January,
> 1977 to meet accessibility standards, and which further require, as
> a matter of policy, that all newly acquired leased buildings be
> accessible whenever economically feasible represent a defensible
> interpretation of the Act.

*Id.* at 12, 27.[6]

As discussed further below, however, the U.S. Court of Appeals for the Ninth
Circuit subsequently rejected the Postal Service interpretation that was addressed
in our 1982 opinion. *See Rose v. United States Postal Serv.*, 774 F.2d 1355 (9th
Cir. 1984).

---

[6] Our opinion went on to acknowledge that "Congress never expressly resolved whether leases of existing space were to be treated like new construction or like existing government-owned buildings " 1982 Opinion at 26.

In 1987, we opined on the applicability of the Act's accessibility requirements to leases originally entered into by federal agencies *prior* to January 1, 1977, and renewed *subsequent* to that date. *See* Memorandum for Charles R. Braun, Assistant General Counsel, United States Postal Service, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel (Oct. 15, 1987) ("1987 Opinion"). That opinion focused on the effective date provisions of the 1976 amendments, which state:

> The amendment made by paragraph (1) of section 201 of this Act [altering the definition of building in section 4151(2) to include buildings leased by federal agencies] shall not apply to any lease entered into before January 1, 1977. It shall apply to every lease entered into on or after January 1, 1977, including any renewal of a lease entered into before such date which renewal is on or after such date.

Public Buildings Cooperative Use Act § 202. The Postal Service argued that the Act's accessibility requirements were not called into play by its "unilateral exercise," subsequent to January 1, 1977, of a renewal option that extended the terms of a pre-1977 lease. We concluded that the subsequent renewal by the Postal Service of leases entered into prior to January 1, 1977, does trigger an obligation to conform the leased facility to the Barriers Act's governing accessibility requirements. As we explained:

> While mindful of the Postal Services' legitimate concerns about cost, we conclude that Congress intended to extend the Barriers Act to renewals of pre-1977 leases of Postal Service facilities with full knowledge of the expense involved and of the understandable reluctance of executive agencies to incur the costs of renovation.
>
> In sum, we believe that the interpretation of "renewal" urged by the Postal Service as including only bilateral, and not unilateral, renewal of leases is not consistent with the language, legislative history, or purpose of the 1976 amendments. In our opinion, Congress intended buildings subject to pre-1977 leases to be renovated in compliance with the Barriers Act when the Postal Service exercises options to renew those leases on or after January 1, 1977.

1987 Opinion at 8–10 (footnotes omitted).

Although our 1987 opinion was largely governed by the terms of the effective date provisions contained in section 202 of the 1976 amendments, and focused on the asserted distinctions between "bilateral" and "unilateral" leases, it also

reflected the more expansive interpretation of the Act's accessibility obligations as to leases reflected in the *Rose* opinion. As we explained:

> Moreover, the legislative history of the Barriers Act reveals that Congress intended this remedial legislation to be liberally construed. *See Rose v. U.S. Postal Service*, 774 F.2d 1355, 1358 (9th Cir. 1984). In introducing the 1976 amendments, Representative Ginn stated that the purpose of the legislation was to include within the coverage of the Barriers Act "all Government-leased buildings intended for public use or in which the physically handicapped might be employed." 122 Cong. Rec. 33,511 (1976). The House report likewise states that "all Government-leased buildings and facilities" would be included. H.R. Rep. No. 1584, pt. 1, 94th Cong., 2d Sess., 3 (1976). There is no suggestion that Congress intended to exempt almost 8,000 post offices simply because, as the Postal Service Claims, leases are renewed unilaterally, rather than bilaterally.

1987 Opinion at 7.

## B.

The only published federal court opinion we have identified interpreting the Barriers Act's applicability to leases is *Rose v. United States Postal Service*.[7] In *Rose*, the Ninth Circuit rejected the same Postal Service contention that had been the subject of our 1982 opinion — i.e., that a federal agency's entry into a lease does not in itself trigger an obligation to conform the leased premises to Barriers Act accessibility standards then in effect. The court framed the precise issue to be decided as follows:

> The Architectural Barriers Act . . . requires that buildings constructed or leased by the federal government be made accessible to handicapped persons. *The issue before us is one of timing*. The Postal Service argues that the Act requires leased buildings to comply when they are altered for some reason other than handicapped access. Plaintiffs argue that the Government must require compliance as a condition of the lease. *The dispute centers on*

---

[7] In a case involving the Government's potential liability for a sidewalk slip injury under the Federal Tort Claims Act, one U.S district court, citing the *Rose* opinion, has noted in dicta that "[t]he Architectural Barriers Act . requires *all* buildings leased by the Postal Service after January 1, 1977, to be accessible to the handicapped." *Wisner v. United States*, 154 F.R D. 39, 44 n.2 (N D.N.Y. 1994) (emphasis added). *Wisner* did not provide any further analysis explaining or supporting this assertion.

> *whether leasing or alteration is the event that triggers the Government's duty under the Act.*

774 F.2d at 1356–57 (emphasis added). The court proceeded to hold that *leasing* is the event that triggers accessibility compliance obligations and that the Postal Service therefore had a duty, without reference to alterations, to make all buildings leased by it after January 1, 1977, accessible to the handicapped. Following an exhaustive analysis of the critical 1976 amendments to the Barriers Act, the court concluded: "Ample evidence exists that Congress intended to close the loophole through which inaccessible buildings were leased without alteration." *Id.* at 1360. In reaching this conclusion, the court invoked the following statement by Representative Edgar during House Committee hearings as reflecting congressional intent on the leasing issue when Congress passed the 1976 amendments to the Act:

> The Act [currently] excludes buildings and facilities leased by the government which were not constructed or altered to government-drafted plans and specifications. This provision . . . excludes many buildings which were leased to the government without substantial alteration. The amendment . . . will solve that problem by including such buildings.

*Public Buildings Cooperative Use: Hearings on H.R. 15134 Before the Subcomm. on Public Buildings and Grounds of the House Comm. on Public Works and Transportation,* 94th Cong. 107–08 (1976) (prepared statement of Representative Edgar) ("House Hearings"). During the same hearings, a representative of the then Department of Health, Education and Welfare ("HEW") similarly testified regarding the intended effect of the 1976 Barriers Act amendments: "If the lease does not involve construction or alteration, then the accessibility requirement does not now apply. . . . The proposed revision would correct this condition to apply the accessibility requirement to all leases." *Id.* at 135 (prepared statement of Gerrit Fremouw, Deputy Assistant Secretary for Facilities Engineering and Property Management, HEW).

Thus, the only court opinion addressing the Barriers Act's applicability to federal agency leases under the 1976 amendments holds that federal agencies executing leases after January 1, 1977, "must require compliance [with Barriers Act accessibility standards] *as a condition of the lease.*" 774 F.2d at 1356 (emphasis added). On the other hand, the *Rose* opinion did not expressly consider the narrower question posed here: whether negotiated renewals of expiring post-1976 leases should be treated as *distinct leasing actions* that trigger compliance obligations defined by standards that have been revised after the date of the original lease. Insofar as the negotiated renewal of an expiring government lease may be

119

equated with the "leasing" of the facility, however, the *Rose* opinion would appear to require that such renewals trigger an obligation to comply with governing standards under the Act. *See id.* Further, inasmuch as our opinions have adopted the view that "renewals constitute new leases under the Act," *see* 1982 Opinion at 12, the *Rose* opinion supports the validity of the Board's proposed guideline.

## C.

The critical point of dispute between the Board and the USPS concerns the negotiated renewal of agency leases first entered into *subsequent* to January 1, 1977. The Barriers Board asserts that its guidelines may treat such negotiated renewals (excluding the unilateral exercise of an existing renewal option) as distinct leasing events that trigger an obligation to comply with superseding accessibility requirements in effect at the time of renewal — even, presumably, if the same building was previously rendered accessible in full compliance with *previous* accessibility standards.[8] The USPS counters, based in large part upon the effective date language of the 1976 amendments, that such renewals do not trigger new compliance obligations; in the USPS view, only first-time renewals of leases entered into *prior to* January 1, 1977, trigger such obligations. USPS Letter at 5.[9] According to the USPS arguments, requiring updated accessibility modifications when an agency enters into a subsequent lease for a building previously rendered accessible would be redundant, excessively burdensome, and unsupported by the provisions and purpose of the Act. *See* USPS Letter at 7–8; USPS Supplement at 2, 4.

Initially, we reject the contention that, by expressly providing that renewals of *pre*-1977 leases are subject to compliance obligations, section 202 of the 1976 amendments implicitly establishes that renewals of *post*-1977 leases are exempt from such obligations. *See* USPS Letter at 5; USPS Supplement at 1. Rather, the explicit provision covering renewals of pre-1977 leases was necessary to avoid any possible misunderstanding that buildings first leased prior to 1977 — which were otherwise wholly exempted from coverage under the amendments — were left permanently exempt, or "grandfathered," from accessibility compliance requirements. Construing section 202 as containing an implicit *restriction* on the Board's authority to enhance accessibility requirements on the basis of future post-1977 leasing actions — i.e., negotiated lease renewals — would be inconsistent with the expansive remedial objectives of the Act and its 1976 amendments.[10]

---

[8] In this regard, the Board also emphasizes that such compliance obligations may be waived under appropriate circumstances to avoid unjust and excessive burdens upon the leasing agency *See* Board Supplement, Attachment at 3.

[9] USPS acknowledges that "a lease when first occupied must be retrofitted to meet the current regulations." USPS Letter at 4.

[10] *See, e.g.,* House Hearings at 107–08, 135, 1987 Opinion at 7.

The amended Act simply does not address whether negotiated renewals of expiring post-1976 leases should require updated accessibility modifications. Rather, that narrow question is the very kind of unspecified, interstitial matter that is properly left to the discretion of the agency charged with primary responsibility for such interpretation — here, the Barriers Board. *See, e.g., Precious Metals Associates, Inc. v. CFTC*, 620 F.2d 900, 911 (1st Cir. 1980) (agency rulemaking proceedings "are designed to fill in the interstices of a statute"); *Public Serv. Co. v. United States Nuclear Regulatory Comm'n*, 582 F.2d 77, 82 (1st Cir.) ("In a regulatory scheme where substantial discretion is lodged with the administrative agency charged with its effectuation, it is to be expected that the agency will fill in the interstices left vacant by Congress."), *cert. denied*, 439 U.S. 1046 (1978). We have previously acknowledged that the Board "has a great deal of discretion" in fashioning guidelines to effectuate the Act's mandate for maximum accessibility, *see* 1980 Opinion at 4, and the interstitital guidelines proposed here fall within the broad authority conferred on the Board.[11]

We recognize that the text of the Act does not specifically require buildings leased by federal agencies after 1976 to be retrofitted to comply with intervening changes in the accessibility standards every time those leases are renewed. *See* 42 U.S.C. § 4155 (buildings "designed, constructed, or altered" must comply with governing standard under the Act). The same can be said, however, with regard to entering into the *initial* lease of an existing building, which similarly does not constitute the "design[ ]," "construct[ion]," or "alter[ation]" of a building that are the only events explicitly mentioned in the provisions governing compliance with the respective accessibility standards. *See* 42 U.S.C. § 4155. But that basic proposition — i.e., that the act of leasing triggers the agency's duty to render a facility accessible under the Act's standards — is both conceded by USPS itself, *see* USPS Letter at 3–4 ("We agree that a lease when first occupied must be retrofitted to meet the current regulations"), and consistent with the *Rose* opinion, *see* 774 F.2d at 1356. Thus, the guidelines' application to post-1976 renewal leases is merely an incremental administrative application of the broader established principle that leasing actions may trigger accessibility compliance obligations under the Act.

---

[11] We acknowledge the USPS argument that the proposed leasing guideline would in one respect subject government-leased buildings to stricter accessibility standards than government-purchased buildings — because the latter would be subjected to updated retrofit obligations only in the event of alterations, whereas leased buildings would be subjected to such obligations in the event of a lease renewal as well as in the case of alterations *See* USPS Letter at 6–7; USPS Supplement at 2 Although USPS contends that this disparity is contrary to congressional intent in enacting the Act and its 1976 amendments, we find no evidence that Congress considered, let alone resolved, such distinctions regarding the details and timing of compliance obligations in the case of federally leased buildings It is clear, however, that Congress intended the Act to be liberally construed to insure the broadest feasible accessibility for persons with disabilities, including accessibility to government-leased buildings *See* 42 U.S C. §§ 4152–4154a; House Hearings at 107–08, 135; *Rose*, 774 F.2d at 1358–59;1987 Opinion at 5 Accordingly, we do not believe that the Board's proposed guideline is inconsistent with the congressional intent underlying the Act's accessibility requirements.

We think it is especially pertinent, moreover, that the Act requires that standard-setting agencies "shall prescribe such standards for the design, construction, and alteration of its buildings to insure whenever possible that physically handicapped persons will have ready access to, and use of, such buildings." 42 U.S.C. § 4154a (emphasis added). That sweeping phrase, "to insure whenever possible," indicates that Congress intended to authorize broad standard-setting authority that would maximize accessibility compliance within the statutory framework. It is therefore permissible, if not mandatory, for the Board to be governed by that strong admonition in discharging its obligation to establish minimum guidelines and requirements for Barriers Act accessibility standards. *See* 29 U.S.C. § 792(b)(3)(A). Given these considerations, and given that we have recognized that the negotiated renewal of an expiring lease is indistinguishable from the execution of a new lease for purposes of the Act, we conclude that imposing a requirement for updated compliance with governing accessibility standards upon an agency's negotiated renewal of a post-1976 lease falls within the substantial discretion allotted to the Board in establishing minimum guidelines for such standards under the Barriers Act. Such guidelines reflect a reasonable interpretation of the statutory requirements, which is entitled to substantial deference.[12]

## CONCLUSION

Taking into account all the foregoing considerations, we conclude that the Board would be acting within its statutory authority under 29 U.S.C. § 792(b) in adopting Guidelines requiring federal agencies to comply with accessibility standards then in effect when they enter or renew building leases, including negotiated renewals of leases originally undertaken by the Federal Government subsequent to 1976.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[12] As one court characterized the role of *Chevron* deference in this same context. "Under *Chevron*, an agency's interpretation of ambiguous statutory language is entitled to deference because of the agency's delegated authority to administer the statute." *PVA v. D.C. Arena L.P.*, 117 F 3d 579, 585 (D C. Cir. 1997), *cert denied*, 523 U S 1003 (1998). Although the standard-setting agencies such as GSA and the USPS have their own authority to set standards under the Act, the Board alone is charged with statutory responsibility to develop and issue the minimum substantive guidelines and requirements that govern those agencies in their issuance of the standards, as well as the authority to ensure compliance with those standards *See* 29 U.S.C § 792(b)(1), (3)(A). In that distinct capacity, the Board's interpretative judgments are entitled to appropriate deference.